OPINION
On April 10, 1998, Defendant-Appellant Sim Jeffrey Maggard ("Maggard") was convicted of murder with a firearm specification, and abduction. That conviction was reversed by this court on June 4, 1999 and remanded for a new trial. In the second trial, Maggard was again convicted of murder with a firearm specification, but found not guilty on the abduction charge. He now appeals his second conviction raising the following assignment of error:
 The Appellant was denied his Constitutional right to effective assistance of counsel as guaranteed by the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and Sections 10 and 16
Article 1 of the Ohio Constitution.
 Because much of the evidence in the first trial was recounted in the second, we will adopt the majority of the facts as written in State v. Maggard (June 4, 1999), Montgomery App. No. 17198, unreported.
According to the trial testimony, Tara Baker met Dean Ritenour at a bar on July 4, 1997, and moved in with Ritenour the next day. At the time, Tara was still married to Rodney Baker. When Tara moved in with Ritenour, Maggard was living in Hamilton, Ohio, with Tara's sister. However, in August 1997, Maggard needed a place to stay because he and Tara's sister had split up. As a result, Maggard moved into Ritenour's home and began working in a carpet-cleaning business owned by Ritenour. Maggard testified that when he first met Ritenour, Ritenour acted normal and was a "good guy." Subsequently, Maggard's impression began to change. When Ritenour drank and used marijuana and Xanax, he got mad and did things for no reason, like shooting his gun inside the house, as well as shooting his television because he was mad at a girlfriend. On one occasion, Maggard testified that Ritenour had thrown a flashlight at his head for no apparent reason. There was testimony that Maggard had a sexual relationship with Tara one day before he met "them" in Kentucky, but there was no evidence presented that Ritenour was aware of this relationship.
Maggard explained the relevant events as follows. About two weeks before November 16, 1997, Maggard claimed that Ritenour began to distance himself from Maggard. Ritenour would go to bars and smoke and drink without Maggard, seemingly trying to stay away from him. Additionally, he would no longer go out on jobs or smoke marijuana with Maggard, as they had done frequently in the past. At approximately the same time, Ritenour asked Maggard to move out while Ritenour served a ten-day jail sentence for DUI. Ritenour felt that it would not be appropriate for Maggard to remain in the house with Tara, Ritenour's girlfriend, while he served his sentence.
The shooting occurred in the early morning hours of Sunday, November 16. On Saturday, November 15, Maggard and Ritenour worked two carpet-cleaning jobs in the morning and then came home for lunch. Maggard then worked two more jobs while Ritenour stayed home. After finishing work, Maggard came back to the house, and Dean and Tara were home. He stayed about an hour and then left for Rick Lamb's house. Before leaving, Maggard did not have any conversation with Ritenour about moving out, nor were there any problems. Later that night, Maggard returned to Ritenour's house about 10:00 PM. At that time, Ritenour looked different. His eyes were red and he looked "evil." During this encounter, Ritenour told Maggard that he and Tara had popped some pills, and then said "if you're here when I get back to the house tonight, I'll kill you. I want you to get all your stuff and pack it up and leave before we get back here." Ritenour and Tara then left the house. Maggard testified that he was afraid at this point. As a result, he decided to leave and began packing his belongings. While he was packing, he noticed Ritenour's gun on the kitchen table.
Also while he was packing, Maggard claims an individual stopped by the house looking for Ritenour. Maggard thought it was Steve Purkey, who previously worked for Ritenour's carpet-cleaning business. This person advised Maggard he was looking for money Ritenour owed him and to tell Ritenour he would be back. Maggard saw "something shiny" in his belt and was afraid it was a gun. As some point thereafter, he contacted a friend, Rick Lamb, and advised him of this visitor. Lamb told Maggard to leave a note for Ritenour to warn him, which Maggard did.
Before Maggard was able to finish packing, Tara and Ritenour returned home. Tara came in the house and screamed at Maggard, "you better get out of the house. Dean is going to kill you. You better go home." Maggard, who had been starting down the hallway, went into the dinette and retrieved the gun off the kitchen table. When he turned around, Ritenour was there. Maggard swore that Ritenour had a gun in his hand. Maggard was panicked because of what Tara had said and fired one shot. The shot struck Ritenour in the face, severed the brain stem, and instantly caused death. After Maggard shot Ritenour, he walked outside and got in his car. He testified that Tara tried to give him money and wanted to follow him in Ritenour's car, but he refused. Subsequently, Maggard threw the gun (a .38 snub-nosed revolver) away in Kentucky.
Tara's story was obviously different. Tara testified no one threatened to kill Maggard, no fighting or arguing had taken place, and no one had asked Maggard to leave the house the day or evening of the shooting. According to Tara, Ritenour did not have to begin serving his ten-day DUI sentence until the end of November. Ritenour did ask Maggard to move out for that ten-day period, because neither Ritenour nor Tara thought it looked right for Maggard to stay in the house alone with Tara. Ritenour even offered to pay for a hotel room for Maggard.
According to Tara, no problems occurred on Saturday and she was not aware of any problems between the two men. When she and Ritenour originally left the house on Saturday evening, Maggard was still there. After leaving the house, Tara and Ritenour first went to a tattoo parlor, where Tara got a tattoo. Next, they went to the Avenue Bar and had some drinks. From there, they went to a friend's house, where Ritenour purchased some Xanax pills. Then, they went home. Maggard was not there at that time and nothing had been packed. While at home, Ritenour phoned a friend, Rick Lamb, at approximately 9:52, to ask if he wanted to go stereo shopping with he and Tara. He declined. At about 10:00, Tara and Ritenour went to Meijer to get a receiver for their stereo. Tara denied that Maggard came home while they were there, and also denied that any argument occurred.
Tara and Ritenour shopped at Meijer for about two hours and returned home at approximately 12:30 AM. Tara came first to the front door and unlocked it. Outside, and right next to the front door was a motion detector shaped like a frog that croaked when people walked by. After Tara unlocked the front door, she walked into the house. When she got a little bit past the front door, she saw Maggard standing behind the door with his hands behind his back. As Ritenour walked in, Tara saw Maggard pull his hands up from behind his back. She also saw a gun. Tara was only able to yell, "Watch out," before Maggard shot. According to Tara, Maggard pulled the gun up with both hands, looked at Ritenour, smiled, and pulled the trigger.
Tara testified that Ritenour did not have a gun. Instead, all he had in his hands when he came in the house were a six-pack of batteries and a Peppermint Patty. After being shot, Ritenour fell down right by the front door. Tara went over and kneeled beside Ritenour to help him. However, Maggard jerked her up by the arm and forced her outside with a gun to her head. Maggard told Tara to get in his car, but she said she could not get in because the car was full of clothes. At that point, a car came up the street, and Maggard left without Tara. Tara then went back in the house and called 911. During the 911 call, Tara was hysterical, and after telling them about the shooting, she said several times, "he was going to shoot me."
That evening, before shooting Ritenour, Maggard had visited Rick Lamb, who was friends with both men. Lamb was aware of the conversations that had taken place about where Maggard would stay during Ritenour's jail sentence. According to Lamb, Maggard did not like the arrangement of going to a motel. Instead, Maggard wanted to either stay at Ritenour's house or go back to Kentucky, where he had previously lived. Maggard did not express anger with Ritenour, but was concerned about where he was going to stay. Before Maggard left Lamb's house, he asked Lamb to go with him to a bar called the Living Room, but Lamb declined. Maggard then settled for directions there from Lamb's house. Later that same night, Maggard called Lamb to say good-bye. During this conversation, Maggard said that he and Ritenour had "just had words." Maggard said Ritenour was not going to let him stay at the house for the ten days, so Maggard was going home to Kentucky. Maggard did not say that Ritenour had told him to leave that day, nor did he say that he was scared or that Ritenour had threatened to kill him. While on the phone, he told Lamb there was a knock at the door and answered it. When he came back to the phone he said that it was "Steve" carrying a .38 looking to shoot Dean in the head for some money that he owed him.
This conversation with Lamb took place around 11:08 PM. Neighbors of Dean Ritenour saw a man loading clothing into an automobile parked in front of the house between 10:30 and 11:25 PM. About 11:25, neighbors heard a gunshot outside the Ritenour house. One neighbor saw a man fitting Maggard's description shoot a gun at a forty-five degree angle towards the ground, right in front of the house. Maggard admitted at trial that he had Dean's .38 caliber gun during the last trip he made out to the car, and fired it into the sidewalk area "to make sure it was loaded."
Maggard testified that although he got directions from Lamb to go to the Living Room that evening, he never actually went. Beth Combs, a waitress at the Living Room, testified to seeing Maggard there sometime before 9:00 PM on November 15, 1997. Also, Steve Purkey testified that although Ritenour did owe him money for some work he had done, he never went to Ritenour's house on November 15 looking for that money.
No weapon of any type was ever found in the house or on Ritenour. One of Maggard's cell-mates testified at trial and indicated that Maggard said he shot Ritenour because he was angry. Supposedly, the two were embroiled in a continuing cycle in which Ritenour supplied Maggard with drugs and then had Maggard work off the debt in the carpet-cleaning business. Apparently, Maggard often either drank or passed out and was not aware of what happened the night before. When Maggard regained consciousness, he was told by Ritenour that he owed a certain amount and had to work it off. Maggard was upset because he felt Ritenour charged him extra and basically took advantage of him. Maggard was angry with Ritenour and told his cell-mate that "I shot that son of a bitch." However, Maggard's sister testified at trial that Maggard had never been a violent person.
The coroner testified that Ritenour's face had ten to fifteen stipple marks surrounding the wound, but no soot or searing. This indicated that the muzzle of the gun was approximately twelve to twenty-four inches from the victim's face when it was fired. He explained that searing only shows up if within three inches, soot only within six inches, and stippling only within twenty-four. The stippling gets more sparse the farther away the gun is from the victim. Conversely, the defense expert testified based solely on reviewing the coroner's report that the diameter of the stipple marks indicated that the muzzle of the gun was two to five inches away from the victim's face when fired. Even the defense expert's testimony does not contradict the State's theory of the case.
Maggard's sole assignment of error alleges that his trial counsel was ineffective by requesting a voluntary manslaughter instruction instead of an involuntary manslaughter instruction. As mentioned previously, this case is in our court for the second time. In his first appeal, although we reversed on other grounds, we upheld the trial court's decision prohibiting a voluntary manslaughter instruction because the evidence did not support it. See State v. Maggard (June 4, 1999), Montgomery App. No. 17198, unreported. When defense counsel requested a voluntary manslaughter instruction during the second trial, the trial court again rejected it.
When a defendant raises a claim of ineffective assistance of counsel, a two-step process is involved. We must determine first whether counsel has violated any essential duties to his client, and second, whether the defendant was prejudiced by counsel's ineffectiveness. State v. Bradley (1989), 42 Ohio St.3d 136,141-42, see also Strickland v. Washington (1984), 466 U.S. 668,687. When determining the ineffectiveness of counsel's performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." Id. at 142, citing Strickland, supra, at 688. However, courts must begin with a strong presumption that counsel's performance was professionally reasonable. Id.
Even if counsel commits a professionally unreasonable error, the judgment will not be set aside unless the error had an effect on the outcome of the trial. Bradley, supra. "To warrant reversal, `[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" Id., citing Strickland, supra, at 694. TheStrickland and Bradley courts further pointed out that a judgment is more likely to have been affected by the error if it is only weakly supported by the evidence. Id. at 143.
Maggard claims his counsel was ineffective because he failed to request an involuntary manslaughter instruction. The supreme court has held that involuntary manslaughter is a lesser included offense of murder. State v. Thomas (1988), 40 Ohio St.3d 213,216. However, an instruction on the lesser offense is only warranted if the evidence at trial supports it. Id.
Specifically, the instruction is not required "unless the trier of fact could reasonably reject an affirmative defense and could reasonably find against the state and for the accused upon one or more of the elements of the crime charged, and for the state and against the accused on the remaining elements, which by themselves would sustain a conviction upon a lesser included offense." Id., citing State v. Kidder (1987), 32 Ohio St.3d 279, 282-83. Further, it is irrelevant how persuasive the evidence is which supports the lesser included offense. State v. Wilkins (1980),64 Ohio St.2d 382, 388. If under any reasonable view of the evidence, considered in a light most favorable to the defendant, it is possible for the jury to find the defendant not guilty of the greater offense and guilty of the lesser offense, then the instruction must be given. Id.
Involuntary manslaughter is defined as "No person shall cause the death of another or the unlawful termination of another's pregnancy as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2903.04(A). In this case, the defendant has claimed that he caused the death as a result of committing felonious assault, which is knowingly causing physical harm to another by means of a deadly weapon or dangerous ordnance. See R.C. 2903.11(A)(2). In other words, when he fired the gun, he only intended to cause physical harm, not kill, Ritenour.
Maggard's testimony would support this version of events. He explained that he was already afraid of Ritenour due to his threat and his recent behavior. Therefore, upon hearing that Ritenour was going to kill him, he grabbed the gun, turned around and fired. If believed, it would indicate that Maggard intended to cause physical harm to Ritenour in order to prevent Ritenour from causing harm to Maggard.
Generally a failure to request jury instructions on a lesser included offense is presumed to be a matter of trial strategy, and therefore does not establish ineffective assistance of counsel.State v. Griffie (1996), 74 Ohio St.3d 332, 333. This is particularly true when the defendant presents a self defense claim and does not want to confuse the jury or reduce the possibility of obtaining an acquittal. See State v. Harris (1998),129 Ohio App.3d 527, 533 (citations omitted). However, this presumption falters somewhat in the present case because trial counsel did request a lesser included instruction, but simply asked for the wrong manslaughter. We found previously that a voluntary manslaughter instruction was not proper in this case, but it appears, at least based on Maggard's testimony, that an involuntary manslaughter instruction was warranted.
Although we believe counsel's assistance was likely ineffective for not requesting an involuntary manslaughter instruction, both the United States and the Ohio Supreme Court have held that it is not necessary for a court to address the two steps in the same order, or even address them both if the defendant has made an insufficient showing on one or the other.Bradley, supra, at 143; Strickland, supra, at 697.
 In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed. Courts should strive to ensure that ineffectiveness claims not become so burdensome to defense counsel that the entire criminal justice system suffers as a result.
 Id. Because we find the prejudice prong to be dispositive, we will now address that portion of the inquiry.
Maggard testified that Ritenour had threatened him at approximately 10:00 on the evening on November 15, 1997 that he would kill Maggard if he was not gone by the time he and Tara returned. The defense pointed out in the record that Ritenour called Lamb at approximately 9:52 and Maggard called his mother at 10:12, which indicates they were likely home at the same time. Maggard further claims that this threat, combined with the distant way Ritenour had been acting in the past few weeks, and his past volatile behavior caused him to be frightened of Ritenour. Because he was already frightened, when Tara ran in and said that Dean was going to kill him, he grabbed the gun off of the table and shot at Dean. Maggard also indicated that he "swore" he saw a gun in Dean's hands when he came in the door. This evidence constitutes the only support for Maggard's version of events.
On the other hand, Tara testified that she and Dean never saw Maggard at home at 10:00 that evening. The phone records indicate a twenty-minute interval between the two calls, so the jury could have inferred that they did not cross paths. Further, if Ritenour had told Maggard he needed to be out of the house before he and Tara returned, one would presume that he would have given Maggard an indication of what time that was going to be. What is more, it seems preposterous that Ritenour would have threatened Maggard's life and then left his only gun, a loaded .38, laying on the kitchen table.
Assuming arguendo that Ritenour did threaten Maggard at 10:00, which frightened Maggard to the point where he would have feared for his life, it is illogical at best that Maggard stayed at the residence for two and a half hours afterwards packing his belongings into his car. Maggard repeatedly testified that he was not leaving his belongings at the house, apparently no matter how frightened he was. However, the testimony indicates that the last trip Maggard made to his car was at approximately 11:25, over an hour before Ritenour was killed. While he was packing, he made three phone calls, one lasting seventeen minutes, smoked some cigarettes and drank some Mountain Dew. There was no testimony he told any of the people he spoke to that Ritenour had threatened him. Instead, he told Lamb only that they "had words." In addition, Maggard informed Lamb that he had decided to move back to Kentucky, not that Ritenour had kicked him out.
Also inconsistent with Maggard's theory of shooting out of fear is that he used both hands when firing the gun only twelve to twenty-four inches from Ritenour's face. This is not consistent with grabbing the gun and shooting wildly while in fear for his life. In addition, Maggard's belief that Ritenour had a gun when he walked in was implausible because he was aware that Ritenour only owned the .38.
We also find the 911 tape particularly telling. During the phone call, Tara is hysterical, sometimes difficult to understand. This contradicts Maggard's testimony that she was not upset when this incident occurred. Further, her version of events as told on the stand was virtually identical to what she told the 911 operator just minutes after it occurred. Moreover, several times during the call she repeated "he was going to shoot me," which supports her testimony that he put the gun to her head and led her outside, further strengthening her credibility. The jury heard the 911 tape at least twice during the trial.
Finally, there is the Steve Purkey story. Maggard testified and told Rick Lamb on the phone that night that Steve Purkey, or someone resembling him, came to the house looking for money from Dean. Lamb testified that according to Maggard, Steve said he was going to "shoot Dean in the head with a .38," if he didn't get his money. At Lamb's request, Maggard left a note for Dean warning him that Steve came by with a gun looking for the money Dean owed him. Not only is it incredibly ironic that Ritenour actually did get shot in the head with a .38, but Steve Purkey testified that he did not even visit Ritenour's house that night.
Although we believe Maggard's version of events would potentially support an involuntary manslaughter theory, based on all of the facts in the record, we do not find there is a reasonable probability the jury would have returned a verdict for involuntary manslaughter. Accordingly, Maggard's conviction cannot be reversed based on ineffective assistance of counsel, so his sole assignment of error is overruled.
Judgment affirmed.
GRADY, P.J., and YOUNG, J., concur.